## In re AMERICA DRY CORPORATION.
### No. 17143.

·District Court, E. D. New York.
May 25, 1931.

Zalkin & Cohen, of New York City (Lewis H. Saper, of New York City, of counsel), for trustee.

Abraham N. Davis, of New York City (Manfred Nathan, of New York City, of counsel), for respondent Gordon.

Saul S. Streit, of New York City (Abraham I. Menin, of New York City, of counsel), for respondents Manhattan Food Specialty Co. and Weinberg.

. Edward Keller, pro se.

BYERS, District Judge.

This is a motion to confirm the report of a referee in bankruptcy directing the turnover of certain property to the trustee.

A report bearing date August 28, 1930, came before Judge Moscowitz on September 19, 1930, and, under date of October 27, 1930, he signed an order referring the matter back to the referee with a suggestion that the findings of fact upon which the report was based and the reasons for his conclu-

sions be set forth in a new report, and, in the interest of justice, an opportunity be granted to the respondents to produce any additional proof which they claimed to possess.

Pursuant to that order, hearings were held on December 26, 1930, and January 16, 1931, and, under date of April 2, 1931, the referee made a supplemental report to the same effect as his first report and setting forth the reasons upon which his conclusions were based.

An involuntary petition in bankruptcy was filed on January 11, 1929, on or about which date the late Jesse Fuller was appointed receiver and took possession of the company and its assets, and conducted the business until February 14, 1929, on which day the assets were sold at public sale.

Mr Fuller was elected Trustee but died before his duties could be completed, and the petitioner herein was duly appointed as his successor.

The bankrupt had been engaged in the manufacture and sale of ginger ale at No. 214 Borden avenue, Long Island City, and it is possible to discern, from the testimony in this proceeding, that internal disputes arose and resulted in factional clashes between certain of the officers and directors during the two months or so which preceded the bankruptcy.

The respondents named in the order to show cause dated October 3, 1929, which is the basis of this proceeding are Mrs. Lena L. Gordon, who owned not less than 50% of the stock of the bankrupt, Edward Keller who became a director of the bankrupt company during the fall of 1928 and seems to have acted as manager during the ensuing eight or ten weeks, Jesse L. Weinberg who is the president of the Manhattan Food Specialty Co., Inc., and the latter corporation.

The petition upon which the order to show cause was granted relates that the receiver continued, during his activities, the said Gordon and Keller in the control and management of the bankrupt, and one Paul Moses. (The latter had been the treasurer of the corporation and was a witness before the referee, but his testimony was not of any particular significance, as to the issues here presented.)

That the Manhattan Co., located at Nos. 326–328 East 108th street, borough of Manhattan, was engaged in the sale of products similar to those manufactured by the bankrupt; and that, while the said Gordon and Keller were in the control and charge of the business under the receiver, they conspired with Weinberg, who was the treasurer of the Manhattan Co,. and the latter, for the purpose of obtaining property and merchandise belonging to the bankrupt and diverting the same to the said Manhattan Co. without payment therefor to the receiver; and that such property was transferred, and the proceeds were concealed and retained from the trustee.

The petition enumerates the items of ginger ale said to have been so diverted, and alleges that the diverted items were not entered in the books and records of the bankrupt, and that the regular sale price and reasonable market value of all of the merchandise so diverted was $8,707.85.

Upon the return of the order to show cause, the matter was referred to Referee Hofmann, with the result first above stated.

The total value of the merchandise found by the referee so to have been diverted, and with which the four respondents are charged, is $7,144.80, and it becomes necessary to examine the proceedings before the referee in an effort to ascertain whether the conclusions are sustained by the evidence.

It will be convenient to divide the transactions to which the report refers into two classes:

First: Those as to which the Manhattan Co. admits indebtedness; such are comprehended in Trustee's Exhibit 3, a loose-leaf ledger sheet, which shows a balance due from the Manhattan Co. of $1,613.00.

This is made up of four items representing merchandise consigned between January 11, 1929, and February 6, 1929, less "empties" and an allowance the nature of which is not disclosed.

The Manhattan Co. disputes one of the four items, amounting to $110.25, and it claims credit for returns of merchandise and empties and other items not requiring recapitulation, totaling $1,005.15, leaving a balance conceded to be due of $705.06.

It will be seen that the difference between the amount claimed under this head by the trustee and the amount conceded to be due from the Manhattan Co. is $907.40. The Manhattan Co. produced receipts, dated February 6th and 7th, respectively, which seem to show total credits of $741.60, but whether the credits so claimed include the credit items shown on Trustee's Exhibit 3, above

referred to, which total $208.00, it is impossible to say.

The referee correctly states that the books and records of the bankrupt during the period of the receivership seem not to have been maintained according to the system formerly employed, by which each sale was shown upon triplicate slips, one retained for accounting purposes, one for the shipping department, and one for the customer, and credit items were recorded in a ledger account; consequently it is impossible, from the available records, to reconcile these differences. Having in mind that Mrs. Gordon and Mr. Keller were ostensibly acting on behalf of the receiver during the period of his administration, it is fair to conclude that the credit items appearing upon Trustee's Exhibit 3 should be deducted from the credits claimed by the Manhattan Co. as duplications, which leaves a difference of $533.60 between the total consignments as shown by Trustee's Exhibit 3 and the total credits claimed by the consignee. The credits claimed in Creditors' Exhibits A and B, signed and identified by the witness Green called by the trustee, will be allowed to the extent of the latter figure.

It will, therefore, be found, for present purposes, that there is due from the Manhattan Co. to the trustee, upon the items recorded in the books of the bankrupt, the sum of $1,079.40. There is no allowance of 25%, apparently, claimed for the Manhattan Co. in connection with these particular transactions.

Second: Irregular transactions established by exhibits produced by the trustee, namely, rough receipts signed by employees of the Manhattan Co.

Without reviewing the testimony at length, it may be said that the deliveries shown by these receipts were made while Gordon and Keller were acting for the trustee, and with the knowledge of Keller. Many of the deliveries were made at night, and could not have been shown except from the testimony of the watchman, and by crude receipts signed by truck drivers. No records were made of them on the sale slips, ledger or other elements of the accounting equipment of the bankrupt.

By reason of the death of Mr. Fuller, the trustee is deprived of the opportunity to establish from his lips the precise nature of the authority conferred upon Keller and Gordon, and the extent to which he confided in them; as the referee truly observes, their demeanor as witnesses was not such as to command confidence. At one stage of the examination, Keller was asked what his sources of income were, because he had testified that he worked for the bankrupt, and for the Manhattan Co. after the bankruptcy, without compensation. He refused to answer, on the ground that to do so might tend to incriminate and degrade him. Later and at the same hearing, he asked to be recalled and permitted to testify that the sources of income to which he referred were payments made for sundry investigations that he conducted for an attorney.

Mrs. Gordon, who established a new ginger ale enterprise on or about March 1, 1929, and who associated herself with Mr. Weinberg in that endeavor, was shown a circular letter soliciting the trade of the bankrupt's customers, issued by her under date of March 6, 1929, and bearing her signature, which she first refused to identify positively, but later admitted to be genuine.

These incidents naturally challenged the credulity of the referee when he was asked to believe that these two witnesses were without knowledge concerning the shipments above referred to, which were shown by receipts signed by a truck driver in the employ of the Manhattan Co., the building of which was occupied by the new Gordon enterprise during its formative period.

It is not the fact, however, that all of the cases of ginger ale now referred to are properly chargeable to the Manhattan Co., because the evidence shows that the "Yukon Club" items were returned in whole or in part, for the reason that this was a private brand of the Atlantic & Pacific Tea Co., shown upon the labels and bottle tops of the bottles in which the ginger ale was purveyed; obviously that brand could not be sold except by the latter company, and the testimony concerning the return is sufficiently convincing to justify deduction of these cases from the total deliveries shown by the rough receipts.

The prices at which the America Dry Ginger Ale was quoted to the Manhattan Co. and the trade was $5.80 per case of 50/12 ounce bottles and $9.80 per case of 100/6 ounce bottles, but this was subject to a discount of 25%, and no reason is stated in the report of the referee for not computing that discount in arriving at the amount which should be charged for the purpose of this proceeding.

A summary of the deliveries covered by the exhibits above referred to, and which are

628

believed to be properly chargeable to the recipient, is as follows:

### Summary

| | Cases of 12 oz. bottles | Cases of 6 oz. bottles | Cases of Unknown bottles |
|---|---|---|---|
| Trustee's Exhibit 4 | 5 | | |
| " " 5 | 8 | | |
| " " 6 | 68 | 27 | |
| " " 7 | 41 | 2 | 100 |
| " " 8 ("Yukon Club" only) | | | |
| " " 9 | | | 83 |
| " " 10 | ( 19 | 31 | |
| | (145 | | |
| Total | 286 | 60 | 183 |

286 cases of 12 oz. bottles at $5.80 per case less 25% .................................... $1,244 10

60 cases of 6 oz. bottles at $9.80 per case less 25% ........................................ 443 70

183 cases of unknown bottles at $5.80 per case less 25% .................................... 796 05

Total ........................................ $2,483 85

The result of the foregoing is that there should be charged in this proceeding the sum of $2,483.85 as the value of the merchandise diverted from the bankrupt estate, in addition to that which was consigned as shown by Trustee's Exhibit 3.

It now becomes necessary to determine whether all of the respondents have been shown to have been in possession of the foregoing property, and, upon this subject, it is necessary to differ with the referee.

Having in mind that the object of this turn-over proceeding is to recover property withheld from the trustee by the respondents, it will be seen that, unless they came into such possession, they cannot be directed to surrender it; while it is entirely probable that the respondents Gordon, Keller and Weinberg contrived to bring about the diversion in question and thereby may have rendered themselves answerable to the trustee in an appropriate action at law, it does not seem that the evidence under examination justifies the making of a turn-over order against them, for the disobedience of which they could be punished for contempt; the drivers who took the goods from the place of business of the bankrupt were just as culpable as the principals who directed their operations, but it is not shown that the diverted merchandise came into the ultimate possession of the drivers any more than that it came into the ultimate possession of the individuals above named.

The reasoning employed in In re Gilroy & Bloomfield (D. C.) 140 F. 733, while the result of different circumstances, reflects the attitude of this court, upon this aspect of the record.

It was the Manhattan Food Co. that received the merchandise and probably profited thereby, and it is that company which should be the subject of the order herein.

The referee's report, therefore, is modified as to the value of the merchandise shown to have been taken, and not returned, and as to the respondents against whom the order should run.

As the consigned merchandise treated under paragraph First hereof never became the property of the Manhattan Food Co., the latter should be directed to return the same or the value thereof as fixed herein, and, as to the other merchandise treated in paragraph Second hereof, the same result should follow.

Settle order on notice, providing for the return of the merchandise, or payment of the sum of $3,563.25, by the Manhattan Food Specialty Co., Inc.